## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil No. 1:16-cv-11152 |
| | ) |
| J.S.B. INDUSTRIES, INC.; | ) |
| JOHN P. ANDERSON AS TRUSTEE OF | ) |
| 130 CRESCENT AVE. REALTY TRUST; | ) |
| JMG ANDOVER STREET REALTY, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

The United States of America, by the authority of the Attorney General, through the

undersigned attorneys, acting at the request of the Administrator of the Environmental Protection

Agency ("EPA"), files this Complaint and alleges as follows:

## NATURE OF ACTION

1.       This is a civil action pursuant to Section 113(b) of the Clean Air Act ("CAA"),

42 U.S.C. § 7413(b), Section 109(c) of the Comprehensive Environmental Response,

Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9609(c), and Section 325(b)(3) of

the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"), 42 U.S.C.

§ 11045(b)(3).  The United States seeks civil penalties and injunctive relief for violations of

Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), Section 103 of the CERCLA, 42 U.S.C. §

9603, and Sections 304, 311 and 312 of EPCRA, 42 U.S.C. §§ 11004, 11021, and 11022.

## PARTIES

2.       Plaintiff is the United States of America.  Authority to bring this action is vested

in the Attorney General by Section 305 of the CAA, 42 U.S.C. § 7605, Section 109(c) of

CERCLA, 42 U.S.C. § 9609(c), and Section 325 of EPCRA, 42 U.S.C. § 11045(f)(1), and 28 U.S.C. §§ 516 and 519.

3.      Defendant J.S.B. Industries, Inc. ("JSB") is a corporation, organized in 1981 under the laws of the Commonwealth of Massachusetts, with corporate headquarters located at 130 Crescent Avenue, in Chelsea, Massachusetts.  JSB also does business as "Muffin Town."

4.      JSB operates a baked goods production, storage, and distribution facility, located at 130 Crescent Avenue, in Chelsea, Massachusetts (the "Chelsea Facility").

5.      JSB also operates a baked goods production, storage, and distribution facility, located at 309 Andover Street, in Lawrence, Massachusetts (the "Lawrence Facility").

6.      Defendant John P. Anderson, as Trustee of 130 Crescent Ave. Realty Trust ("Anderson"), is an individual sued in his capacity as Trustee of the 130 Crescent Ave. Realty Trust.

7.      Anderson is a resident of Winthrop, Massachusetts.

8.      The 130 Crescent Ave. Realty Trust ("Trust") is a nominee trust organized under the laws of the Commonwealth of Massachusetts.

9.      Defendant JMG Andover Street Realty, LLC ("JMG") is a limited liability corporation, organized under the laws of the Commonwealth of Massachusetts, with its corporate headquarters located at 130 Crescent Avenue, in Chelsea, Massachusetts.

10.     Each Defendant is a "person" within the meaning of:

   a.      Section 302(e) of the CAA, 42 U.S.C. § 7602(e);

   b.      Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and 40 C.F.R. § 302.3; and

   c.      Section 329(7) of EPCRA, 42 U.S.C. § 11049(7), and 40 C.F.R. § 355.61.

2

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action, and over Defendants JSB, Anderson, and JMG (collectively, "Defendants"), pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and 28 U.S.C. §§ 1331, 1345, and 1355.

12.     Venue is proper in this District under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and 28 U.S.C. §§ 1391(b)-(c) and 1395(a), because each Defendant resides within this judicial District, all or a substantial part of the events or omissions giving rise to the claims in this Complaint occurred within this District, all or a substantial part of the property that is the subject of this action is situated in this District, and the civil penalties sought in this action have accrued in this District.

13.     Notice of commencement of this action has been given to the Commonwealth of Massachusetts pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## STATUTORY AND REGULATORY FRAMEWORK

### Clean Air Act

14.     The CAA, 42 U.S.C. §§ 7401 *et seq.*, establishes a comprehensive scheme for air pollution prevention and control, as described in Section 101 of the CAA, 42 U.S.C. § 7401.

15.     Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

16.     The purpose of Section 112(r) of the CAA and its implementing regulations is "to prevent the accidental release and to minimize the consequences of any such release" of an "extremely hazardous substance."  42 U.S.C. § 7412(r)(1).

17.     Section 112(r)(1) of the CAA, known as the "General Duty Clause," provides, in pertinent part:

> The owners and operators of stationary sources producing, processing, handling or storing [any extremely hazardous] substances have a general duty . . . to identify hazards which may result from such releases [of extremely hazardous substances] using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

42 U.S.C. § 7412(r)(1) (bracketed notations added).

18.     Pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), the term "extremely hazardous substances" includes, but is not limited to, substances listed in 40 C.F.R. § 68.130, and in 40 C.F.R. Part 355, Appendices A and B, published under Section 302 of EPCRA, 42 U.S.C. § 11002.

19.     The term "accidental release" is defined in Section 112(r)(2)(A) of the CAA, 42 U.S.C. § 7412(r)(2)(A), to mean an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

20.     The term "stationary source" is defined in Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), to mean, in pertinent part, any buildings, structures, equipment, installations or substance-emitting stationary activities, located on one or more contiguous properties under the control of the same person, from which an accidental release may occur.

21.     Under Section 113(a)(3)(B) of the CAA, 42 U.S.C. § 7413(a)(3)(B), if the Administrator of EPA makes a finding that a person has violated a requirement or prohibition of Subchapter I of the CAA, 42 U.S.C. §§ 7401-7515, including CAA Section 112(r), 42 U.S.C.

§ 7412(r), and including any requirement or prohibition of any rule promulgated under CAA

Subchapter I, then the Administrator may issue an order requiring the person to comply with

such requirement or prohibition.

22.     Under Section 114(a)(1) of the CAA, 42 U.S.C. § 7414(a)(1), EPA has the

authority to require any person who owns or operates any emission source to establish and

maintain records, make reports, sample emissions, and provide such other information as may

reasonably be required to enable EPA to determine whether a facility is in compliance with the

CAA.

23.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the United States to

commence a civil judicial enforcement action for violations of any requirement or prohibition of

Subchapter I of the CAA, 42 U.S.C. §§ 7401-7515, including Sections 112(r), 113(a)(3), and

114(a), 42 U.S.C. §§ 7412(r), 7413(a), and 7414(a), and including any requirement or prohibition

of any rule or order promulgated or issued under CAA Subchapter I, seeking civil penalties of up

to $25,000 per day for each violation, injunctive relief, or both.

24.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461 ("DCIA"), as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C.

§ 3701, and EPA's Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19,

promulgated pursuant to the DCIA (collectively, the "Inflation Adjustment Rule"), the maximum

amount of civil penalties for which a person shall be liable under CAA Section 113(b), 42 U.S.C.

§ 7413(b), was increased to $27,500 per day for each violation occurring after January 30, 1997,

through March 15, 2004; $32,500 per day for each violation occurring after March 15, 2004,

through January 12, 2009, and $37,500 per day for each violation occurring after January 12,

2009.

**Comprehensive Environmental Response, Compensation, and Liability Act**

25.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires that any person in charge of an onshore facility report the non-permitted release of a hazardous substance from the facility to the National Response Center as soon as that person has knowledge of such a release in an amount equal to or greater than the reportable quantity under Section 102 of CERCLA, 42 U.S.C. § 9602, and 40 C.F.R. § 302.4.

26.     Section 102(a) of CERCLA, 42 U.S.C. § 9602(a), requires the Administrator of EPA to, among other things, promulgate regulations establishing the reportable quantities of any hazardous substance the release of which shall be reported pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603.

27.     Pursuant to CERCLA Sections 102 and 103, 42 U.S.C. §§ 9602 and 9603, EPA promulgated federal regulations, known as the "CERCLA Notification Rules," published at 40 C.F.R. Part 302.  These CERCLA Notification Rules designate hazardous substances, identify reportable quantities for these substances, and set forth notification requirements for these substances.

28.     The regulations at 40 C.F.R. § 302.6 require, among other things, that any person in charge of an onshore facility shall, as soon as he or she has knowledge of any non-permitted release of a hazardous substance from such facility in quantities equal to or greater than the reportable quantity, immediately notify the National Response Center of such release.

29.     Pursuant to Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), the United States may bring an action for a civil penalty of up to $25,000 for each day during which a violation of the notice requirements of CERCLA Section 103(a), 42 U.S.C. § 9603(a), continues, and up to

$75,000 for each day during which a second or subsequent violation of such notice requirements continues.

30.     Pursuant to the DCIA and the Inflation Adjustment Rule, for each day during which an initial violation (or failure or refusal) of the notice requirements of CERCLA Section 103(a), 42 U.S.C. § 9603(a), continues, the civil penalty under CERCLA Section 109(c), 42 U.S.C. § 9609(c), was increased to $27,500 per day for each violation occurring after January 30, 1997, through March 15, 2004; $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and $37,500 per day for each violation occurring after January 12, 2009.  For each day during which a second or subsequent violation of such notice requirements continues, the civil penalty under CERCLA Section 109(c) was increased to $82,500 per day for each violation occurring after January 30, 1997, through March 15, 2004; $97,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and $107,500 per day for each violation occurring after January 12, 2009.

## Emergency Planning and Community Right-to-Know Act

### Section 304 of EPCRA

31.     Pursuant to Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), and 40 C.F.R. Part 355, if a release of an extremely hazardous substance, within the meaning of Section 302(a) of EPCRA, 42 U.S.C. § 11002(a), in excess of the substance's reportable quantity occurs from a facility at which a hazardous chemical is produced, used, or stored, then the owner or operator of the facility shall immediately provide notice of such release to the local emergency planning committee ("LEPC") for any area likely to be affected by the release and to the state emergency response committee ("SERC") of any state (including commonwealth) likely to be affected by the release, as provided in Section 304(b) of EPCRA, 42 U.S.C. § 11004(b).

32.     Section 304(b) of EPCRA, 42 U.S.C. 11004(b), specifies the information that must be included in any notice required pursuant to EPCRA Section 304(a), 42 U.S.C. 11004(a).

33.     Pursuant to Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), the Administrator of EPA may bring an action for a civil penalty of up to $25,000 for each day during which a violation of the notice requirements of EPCRA Section 304, 42 U.S.C. § 11004, continues, and up to $75,000 for each day during which a second or subsequent violation of such notice requirements continues.

34.     Pursuant to the DCIA and the Inflation Adjustment Rule, for each day during which an initial violation of the notice requirements of EPCRA Section 304, 42 U.S.C. § 11004, continues, the civil penalty under EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), was increased to $27,500 per day for each violation occurring after January 30, 1997, through March 15, 2004; $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and $37,500 per day for each violation occurring after January 12, 2009. For each day during which a second or subsequent violation of such notice requirements continues, the civil penalty under EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), was increased to $82,500 per day for each violation occurring after January 30, 1997, through March 15, 2004; $97,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and $107,500 per day for each violation occurring after January 12, 2009.

## Section 311 of EPCRA

35.     Pursuant to Section 311(a) of EPCRA, 42 U.S.C. § 11021(a), and 40 C.F.R. Part 370, the owner or operator of a facility that is required by the Occupational Safety and Health Act, 29 U.S.C.§ 651 *et seq.* ("OSHA"), to prepare or have available a material safety data sheet ("MSDS") for a hazardous chemical must submit an MSDS for each hazardous chemical present

at the facility (or a list of such chemicals pursuant to Section 311(a)(2) of EPCRA, 42 U.S.C.

§ 11021(a)(2)) to the SERC, the LEPC, and the fire department with jurisdiction over the facility,

within three months after the deadline for preparation of the MSDS.

36.     Section 311(b) of EPCRA, 42 U.S.C. § 11021(b), authorizes EPA to establish

minimum threshold levels of hazardous chemicals for the purposes of Section 311(a) of EPCRA,

42 U.S.C. § 11021(a).  Section 311(a) requirements are triggered if the amount present at the

facility is equal to or greater than 500 pounds or the Threshold Planning Quantity for the

chemical, under 40 C.F.R. Part 355, App. A and B, whichever is lower. 40 C.F.R.

§ 370.20(b)(1).

37.     Pursuant to Section 325(c)(2) of EPCRA, 42 U.S.C. § 11045(c)(2), the

Administrator of EPA may bring an action for a civil penalty of up to $10,000 for each violation

of any requirement of EPCRA Section 311, 42 U.S.C. § 11021.

38.     Pursuant to the DCIA and the Inflation Adjustment Rule, the maximum amount of

civil penalties for which a person shall be liable under EPCRA Section 325(c)(2), 42 U.S.C.

§ 11045(c)(2), was increased to $11,000 for each violation of EPCRA Section 311, 42 U.S.C.

§ 11021, occurring after January 30, 1997, through January 12, 2009, and $16,000 for each such

violation occurring after January 12, 2009.

Section 312 of EPCRA

39.     Pursuant to Section 312(a) of EPCRA, 42 U.S.C. § 11022(a), and 40 C.F.R. Part

370, the owner or operator of a facility that is required to prepare or have available an MSDS for

a hazardous chemical under OSHA and implementing regulations, including 29 C.F.R.

§ 1910.1200(c) and (g), shall prepare an emergency hazardous chemical inventory form

("Inventory Form") and submit it to the appropriate SERC, LEPC, and fire department with

jurisdiction over the facility, annually, on or before March 1 of each year containing information for the preceding calendar year.

40.    Section 312(b) of EPCRA, 42 U.S.C. § 11022(b), authorizes EPA to establish minimum threshold levels of hazardous chemicals for the purposes of Section 312(a) of EPCRA, 42 U.S.C. § 11022(a).  Section 312(a) requirements are triggered if the amount of the hazardous chemical present at the facility is equal to or greater than 500 pounds or the Threshold Planning Quantity for the chemical, under 40 C.F.R. Part 355, App. A and B, whichever is lower. 40 C.F.R. § 370.20(b)(1).  Pursuant to Section 312(a)(2) of EPCRA, 42 U.S.C. § 11022(a)(2), and 40 C.F.R. Part 370, the Inventory Form shall contain "Tier I" information for the preceding calendar year, pursuant to EPCRA Section 312(d)(1), unless the owner or operator provides "Tier II" information, pursuant to EPCRA Section 312(d)(2), for the same time period by the same deadline.

41.    The Commonwealth of Massachusetts requires facilities subject to EPCRA Section 312 to submit "Tier II" forms containing chemical-specific information, rather than "Tier I" forms containing aggregate information by hazard category. *See* SERC Policy Position (updated 12/17/98), currently available at http://www.mass.gov/eopss/agencies/mema/emergency-info/haz-mat/serc/serc-policy-position.html.

42.    Pursuant to Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), the Administrator of EPA may bring an action for a civil penalty of up to $25,000 for each violation of any requirement of EPCRA Section 312, 42 U.S.C. § 11022.

43.    Pursuant to the DCIA and the Inflation Adjustment Rule, the maximum amount of civil penalties for which a person shall be liable under EPCRA Section 325(c)(1), 42 U.S.C.

§ 11045(c)(1), was increased to $27,500 for each violation of EPCRA Section 312, 42 U.S.C.

§ 11022, occurring after January 30, 1997, through March 15, 2004; $32,500 per day for each

violation occurring after March 15, 2004, through January 12, 2009; and $37,500 per day for

each violation occurring after January 12, 2009.

## GENERAL ALLEGATIONS

### Chelsea Facility

44.     At all times relevant to the allegations in this Complaint, JSB owned or operated

the Chelsea Facility.

45.     JSB commenced operations at the Chelsea Facility in or about 2000.

46.     At all times relevant to the allegations in this Complaint, Anderson has held title

to the real property encompassing the Chelsea Facility.

47.     At all times relevant to the allegations in this Complaint, Anderson has been an

"owner" of the Chelsea Facility, within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C.

§ 7412(a)(9), and Sections 304, 311, 312 and 325 of EPCRA, 42 U.S.C. §§ 11004, 11021,

11022, and 11045.

48.     At all times relevant to the allegations in this Complaint, Anderson has been a

"person in charge" of the Chelsea Facility, within the meaning of Section 103(a) of CERCLA,

42 U.S.C. § 9603(a).

49.     At all times relevant to the allegations in this Complaint, from approximately

August 2006 to March 28, 2012, operations at the Chelsea Facility included use of an ammonia

refrigeration system that contained about 2,000 pounds of anhydrous ammonia ("Chelsea

Refrigeration System," "Ammonia Refrigeration System," or "System").  The System was a

"closed-loop" refrigeration system, with components and piping located primarily in an area of the Chelsea Facility known as the "Machinery Room" or "Engine Room."

50.     Anhydrous ammonia is a concentrated form of ammonia. Anhydrous ammonia is corrosive and may burn skin, eyes, and lungs. It has a boiling point of approximately -28°F and may cause frostbite. Anhydrous ammonia is hydrophilic (or "hygroscopic"), meaning it has a high affinity for water and migrates to moist areas of the body, such as eyes, nose, mouth, throat, and lungs. Exposure to ammonia at 300 parts per million ("ppm") is immediately dangerous to life or health. Ammonia is flammable at concentrations of approximately 15% to 28% by volume in air and can explode if released in an enclosed space with a source of ignition present.

51.     Industry trade associations have issued standards for recognized and generally accepted good engineering practices (commonly known as "RAGAGEPs") in the ammonia refrigeration industry. The International Institute of Ammonia Refrigeration ("IIAR"), in collaboration with the American National Standards Institute ("ANSI"), issued "American National Standards" for ammonia refrigeration systems, including without limitation "Equipment, Design, and Installation of Closed-Circuit Ammonia Mechanical Refrigerating Systems" ("ANSI/IIAR 2-1999") and "Equipment, Design, and Installation of Closed-Circuit Ammonia Mechanical Refrigerating Systems ("ANSI/IIAR Standard 2" or "ANSI/IIAR 2-2008"). IIAR, in collaboration with ANSI, issued other standards and guidance documents for ammonia refrigeration, including without limitation the "IIAR Process Safety Management Guidelines for Ammonia Refrigeration (1998)" ("IIAR PSM Guidelines"). The American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE"), in collaboration with ANSI, issued refrigeration standards, including without limitation the "Safety Standard for Refrigeration Systems" ("ANSI/ASHRAE Standard 15-2004"). IIAR also

12

published bulletins and guidance documents for ammonia refrigeration systems, including without limitation: the 2005 *Ammonia Refrigeration Management Program* ("IIAR ARM Program"), intended for systems containing less than 10,000 pounds of ammonia; IIAR Bulletin No. 109, "Guidelines for IIAR Minimum Safety Criteria for a Safe Ammonia Refrigeration System (1997)"; IIAR Bulletin No. 110 "Guidelines for Start-Up, Inspection, and Maintenance of Ammonia Mechanical Refrigerating Systems (rev. 2002)"; IIAR Bulletin No. 114, "Guidelines for Identification of Ammonia Refrigeration Piping and System Components 1991"; and IIAR Bulletin 116, "Guidelines for Avoiding Component Failure in Industrial Refrigeration Systems Caused by Abnormal Pressure or Shock (1992)." At all times relevant to the allegations in this Complaint, these standards and guidelines have been used in the refrigeration industry and often incorporated, directly or by reference, into state building and mechanical codes, including in Massachusetts. *See, e.g.*, 780 C.M.R. 1.00 *et seq.*

52.     At all times relevant to the allegations in this Complaint, from approximately August 2006 to March 28, 2012, approximately 2,000 pounds of anhydrous ammonia was processed, handled, used, or stored at the Chelsea Facility.

53.     Sulfuric acid is corrosive. Exposure to it may result in severe burns and damage to skin or mucous membranes. Sulfuric acid is highly reactive and can ignite combustible materials on contact. When heated, it emits highly toxic fumes. It can also react violently with water.

54.     At all times relevant to the allegations in this Complaint, from about August 2006 to the present, operations at the Chelsea Facility included the use of approximately 2,080 pounds of sulfuric acid, mainly present in the batteries of heavy equipment, in such a manner as constitutes processing, handling, use, or storage under EPCRA.

13

55.      Chelsea, Massachusetts is a densely populated city located directly across the Mystic River from the City of Boston, Massachusetts.  The Chelsea Facility encompasses approximately 2.1 acres of land, surrounded by residential and commercial properties.  Multi-unit residential dwellings are located close to the Chelsea Facility to the north, northeast, and west.  Commercial buildings are located close to Chelsea Facility to the east and south.  At least one residential property is located less than 50 feet from the facility's Engine Room.  The Chelsea Facility is within approximately 250 feet of a commuter rail line and within a half-mile of downtown Chelsea, including City Hall and the public library, and an interstate highway known as U.S. Route 1.

56.      On April 1, 2009, at about 9:05 a.m., there was a release of approximately 2,000 pounds of anhydrous ammonia from the Chelsea Refrigeration System (the "2009 Release").  That amount represented all, or substantially all, of the ammonia in the System.  Upon information and belief, the 2009 Release was the result of a pump failure in the System.

57.      On April 1, 2009, at about 10:16 a.m., a resident of a nearby home called 911 and reported smelling a strange odor from the vicinity of the Chelsea Facility.

58.      On April 1, 2009, by about 10:23 a.m., emergency response personnel from the Chelsea Fire Department arrived at the Chelsea Facility.

59.      Prior to the 2009 Release, the Chelsea Fire Department had received no notice from JSB or Anderson that anhydrous ammonia, sulfuric acid, or any other extremely hazardous substance, was processed, handled, used, or stored at the Chelsea Facility.

60.      On April 1, 2009, upon arriving at the Chelsea Facility, emergency response personnel from the Chelsea Fire Department reported that two of its firemen were exposed to

ammonia gas from the 2009 Release.  As a result of this exposure, at least one of the firemen was transported to a hospital for medical treatment.

61.     After the 2009 Release, upon information and belief, initial measurements showed that the ammonia vapor levels in the Engine Room at the Chelsea Facility were above the upper detection limits of the instruments used for those measurements.

62.     On or about July 6, 2011, EPA issued to the Chelsea Defendants a Notice of Violation and Administrative Order ("Order"), under Section 113(a)(3) of the CAA, 42 U.S.C. § 7413(a)(3).  Among other things, the Order included findings that the Chelsea Defendants had violated Section 112(r)(1) of the CAA, and ordered them to comply with the General Duty Clause and to address such violations by taking certain actions in accordance with a specified schedule.  The Order required the Chelsea Defendants to submit to EPA, within 45 days of the effective date of July 6, 2011 (*i.e.*, by August 20, 2011), a work plan and schedule to correct any design deficiencies that could expose people to hazards from accidental ammonia releases, as identified by a professional engineer with experience in designing ammonia refrigeration systems in accordance with state and industry standards.  The Order required that this schedule and work plan, once approved by EPA, shall be enforceable under the Order and that all work must be complete no later than June 30, 2012.  The Order also required the Chelsea Defendants to certify, by August 20, 2011, that waste oil or other flammable materials were not being stored in the Chelsea Facility's Engine Room and that JSB was implementing an inspection protocol to ensure that the compressor's waste oil collector does not overfill and leak.  The Order further required the Chelsea Defendants to submit to EPA, by August 20, 2011, a revised emergency response plan, including procedures to notify 911, the Chelsea Fire Department, the LEPC, the

SERC, and the National Response Center of any future releases of ammonia from the Chelsea refrigeration system.

63. On March 8, 2012, at about 12:06 p.m., there was a release of approximately 50 pounds of anhydrous ammonia from the Ammonia Refrigeration System at the Chelsea Facility (the "2012 Release").

64. On March 8, 2012, in response to the 2012 Release, the Chelsea Fire Department evacuated approximately 150 people from a one-block area around the Chelsea Facility.

65. Later in March 2012, JSB replaced the Ammonia Refrigeration System at the Chelsea Facility with a liquid nitrogen refrigeration system.

### Lawrence Facility

66. At all times relevant to the allegations in this Complaint, JSB operated the Lawrence Facility.

67. JSB commenced operations at the Lawrence Facility in or about February 2011.

68. At all times relevant to the allegations in this Complaint, JMG has held title to the real property encompassing the Lawrence Facility.

69. At all times relevant to the allegations in this Complaint, JMG has been an "owner" of the Lawrence Facility, within the meaning of Sections 311, 312 and 325 of EPCRA, 42 U.S.C. §§ 11021, 11022, and 11045.

70. At all times relevant to the allegations in this Complaint, since approximately February 2011, operations at the Lawrence Facility included the use of approximately 2,080 pounds of sulfuric acid, primarily in the batteries of heavy equipment.

71.     Lawrence, Massachusetts is a densely populated city located approximately 25 miles north of Boston.  The Lawrence Facility encompasses approximately 3.6 acres of land, surrounded by residential and commercial properties.

72.     At all times relevant to the allegations in this Complaint, from about February 2011 to the present, approximately 2,080 pounds of sulfuric acid was processed, handled, used, or stored at the Lawrence Facility.

### FIRST CLAIM FOR RELIEF
(CAA Section 112(r)(1) – Failure to Identify Hazards)

73.     All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

74.     Anhydrous ammonia is included on the list of substances in Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), known to cause death, injury, or serious harm to human health or the environment.

75.     Ammonia is included on the list of extremely hazardous substances in 40 C.F.R. Part 355, Appendix A.  Anhydrous ammonia is a concentrated form of ammonia, within the meaning of 40 C.F.R. Part 355, Appendix A.

76.     Anhydrous ammonia is an "extremely hazardous substance," within the meaning of CAA Section 112(r), 42 U.S.C. § 7412(r).

77.     Sulfuric acid is included on the list of extremely hazardous substances in 40 C.F.R. Part 355, Appendix A.

78.     Sulfuric acid is an "extremely hazardous substance," within the meaning of CAA Section 112(r), 42 U.S.C. § 7412(r).

79.     At all times relevant to the allegations in this Complaint, the Chelsea Facility has been a "stationary source," within the meaning of Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C).

80.     At all times relevant to the allegations in this Complaint, the Chelsea Facility was subject to the CAA General Duty Clause. 42 U.S.C. § 7412(r)(1).

81.     At all times relevant to the allegations in this Complaint, JSB owned or operated a stationary source, within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9).

82.     At all times relevant to the allegations in this Complaint, Anderson owned or operated a stationary source within the meaning of Section 112(a)(9) of the CAA.

83.     The 2009 Release of extremely hazardous substances from the Chelsea Facility constituted an "accidental release" within the meaning of Section 112(r)(2)(A) of the CAA, 42 U.S.C. § 7412(r)(2)(A).

84.     Pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), at all times relevant to the allegations in this Complaint, JSB and Anderson (the "Chelsea Defendants") each had a general duty to identify hazards, using appropriate hazard assessment techniques, which may result from the accidental release of an extremely hazardous substance at or from the Chelsea Facility.

85.     Industry standards and guidelines for RAGAGEP with respect to ammonia refrigeration systems are found, *inter alia*, in the IIAR ARM Program, the IIAR PSM Guidelines, ANSI/IIAR Standard 2, ANSI/ASHRAE Standard 15, IIAR bulletins, and other materials (including updates and revisions) consistently relied upon in the refrigeration industry at times relevant to the allegations in this Complaint.

86.     The recommended industry practice and standard of care for identifying,

analyzing, and evaluating potential hazards associated with ammonia refrigeration systems of the

same size and type as the Chelsea Facility's Ammonia Refrigeration System is, *inter alia*, to use

standard, industry-developed hazard identification checklists, a "What If" analysis, or a Hazard

and Operability (a/k/a "HAZOP") study.  IIAR has developed checklists for this purpose. See,

*e.g.*, IIAR PSM Guidelines, Chapter 4, and IIAR ARM Program, Section 10 and Appendix 10.1.

*See also* U.S. Environmental Protection Agency, "Guidance for Implementation of the General

Duty Clause Clean Air Act Section 112(r)(1)," May 2000 ("EPA GDC Guidance"), Section

2.3.1, currently available at

http://www.epa.gov/emergencies/docs/chem/gdcregionalguidance.pdf.

87.     At all times relevant to the allegations in this Complaint, the Chelsea Defendants

each failed in its general duty to identify hazards, using appropriate hazard assessment

techniques, which may result from the accidental release of anhydrous ammonia at or from the

Chelsea Facility, in at least the following respects:

        a.      failing to conduct a hazard analysis of the Ammonia Refrigeration System,

using industry-recognized hazard assessment techniques;

        b.      failing to identify hazards associated with the exposure of emergency

response personnel and members of the public, including without limitation members of the

Chelsea Fire Department and occupants of homes or businesses located near the Chelsea Facility,

to anhydrous ammonia;

        c.      failing to implement a program for identifying the hazards associated with

the Ammonia Refrigeration System, evaluating the risks associated with the System, and

recommending corrective actions for the System, in accordance with applicable industry standards; and

        d.     failing to perform an off-site consequence analysis ("OCA") to evaluate potential ammonia releases, identify worst-case and alternative scenarios, determine population affected by such scenarios, and identify off-site public receptors, in accordance with applicable industry standards.

        88.     During the time the Chelsea Facility included the Ammonia Refrigeration System, the Chelsea Defendants each failed to use appropriate assessment techniques to identify hazards at the Chelsea Facility from at least the following:

        a.     the inability of Chelsea Facility personnel to activate roof-mounted ventilation units, in the event of an accidental release of anhydrous ammonia from the Ammonia Refrigeration System;

        b.     the inability of Chelsea Facility personnel to activate ammonia shut-off valves, in the event of an accidental release of anhydrous ammonia from the Ammonia Refrigeration System;

        c.     the position of the discharge point (or extremity or end of the header pipe) of the pressure relief valve for the Ammonia Refrigeration System, located at the rear of the Engine Room (*i.e.*, the side closest to Eleanor Street), insufficiently above roof level;

        d.     the position of one or more discharge point(s) for exhaust from the Ammonia Refrigeration System's ventilation system(s) insufficiently away from the Chelsea Facility's property line or any window, ventilation opening, or exit in any building;

        e.     the storage of waste oil and other flammable materials in the Engine Room;

   f.  the potential overfilling and leakage of waste oil from the waste oil collector for the Ammonia Refrigeration System's compressor;

   g.  inadequate training of Chelsea Facility personnel in the operation of, or response to releases of extremely hazardous substances at or from, the Ammonia Refrigeration System;

   h.  failure of Chelsea Facility personnel to develop or follow appropriate standard operating procedures for the Ammonia Refrigeration System;

   i.  failure to timely report the presence or use of extremely hazardous substances, including anhydrous ammonia, at the Chelsea Facility, to appropriate local, state, and federal officials, including the SERC, LEPC, and Chelsea Fire Department; and

   j.  failure to have in place proper notification procedures for use in the event of an accidental release at the Chelsea Facility of an extremely hazardous substance, such as anhydrous ammonia.

  89.  The Chelsea Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that they failed to identify hazards which may have resulted from the accidental release of an extremely hazardous substance at or from the Chelsea Facility using appropriate hazard assessment techniques.

  90.  Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, the Chelsea Defendants are each liable for the payment of a civil penalty to the United States of up to $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and up to $37,500 per day for each violation occurring after January 12, 2009, of the general duty to identify hazards which may result from the accidental release of an extremely hazardous substance at or from the Chelsea Facility using

appropriate hazard assessment techniques, pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

## SECOND CLAIM FOR RELIEF
(CAA Section 112(r)(1) – Failure to Design and Maintain a Safe Facility)

91.     All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

92.     Pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), at all times relevant to the allegations in this Complaint, the Chelsea Defendants each had a general duty to design and maintain the Chelsea Facility as a safe facility taking such steps as are necessary to prevent a release of an extremely hazardous substance at or from the Chelsea Facility.

93.     The recommended industry practice and standard of care for designing and maintaining a safe facility employing an ammonia refrigeration system of the same size and type as the Ammonia Refrigeration System is to base design considerations upon applicable design codes, federal and state regulations, and industry guidelines to prevent releases or minimize their impacts as well as to develop and implement standard operating procedures, personnel training programs, management of change practices, and incident investigation procedures. IIAR, ASHRAE and others have developed standards and guidelines for this purpose including, *inter alia*, the IIAR PSM Guidelines, ANSI/IIAR 2-2008,, the IIAR ARM Program, and ANSI/ASHRAE Standard 15. *See also* EPA GDC Guidance, Section 2.3.2.

94.     At all times relevant to the allegations in this Complaint, the Chelsea Defendants each failed in its general duty to design and maintain the Chelsea Facility as a safe facility taking such steps as are necessary to prevent a release of an extremely hazardous substance, in accordance with applicable industry standards, in at least the following respects:

22

      a.      failing to install adequate machinery exhaust fans for the Ammonia Refrigeration System;

      b.      failing to implement a program for reviewing and evaluating the qualifications of contractors used for the design, construction, installation, operation, and maintenance of the Ammonia Refrigeration System;

      c.      failing to implement a preventive maintenance program to insure that the emergency exhaust fans for the Ammonia Refrigeration System were maintained in an operable condition;

      d.      failing to design and maintain the Chelsea Facility so that the discharge points of pressure-relief devices for the Ammonia Refrigeration System were sufficiently above the roof level or adjacent grade;

      e.      failing to design and maintain the Chelsea Facility so that the outlet end of the header pipe of the roof-mounted relief valve for the Ammonia Refrigeration System was sufficiently:  (i) away from the edge of the roof; (ii) away from the facility property line or any window, ventilation opening, or exit in any building; and (iii) above the level of the roof;

      f.      failing to avoid the storage of waste oil and other flammable materials in the Engine Room;

      g.      failing to design and maintain the Chelsea Facility so as to prevent the overfilling and leakage of waste oil from the Ammonia Refrigeration System compressor's waste oil collector;

      h.      failing to provide adequate ammonia awareness training to its employees and contractors at the Chelsea Facility;

i.      failing to implement a program for the collection, organization, and review of process safety information regarding the Ammonia Refrigeration System, for use by workers and contractors servicing and maintaining the System;

j.      failing to implement a program for the collection, organization, and review of operating procedures for the Ammonia Refrigeration System, for use by workers and contractors servicing and maintaining the system;

k.      failing to implement a program for revising, evaluating, and managing changes to the Ammonia Refrigeration System;

l.      failing to implement a program for documenting site-specific ammonia equipment maintenance training for employees at the Chelsea Facility;

m.      failing to implement a program for documenting site-specific safety training for employees and contractors at the Chelsea Facility;

n.      failing to implement a program for investigating incidents that might or do lead to the release of an extremely hazardous substance at or from the Chelsea Facility;

o.      failing to display signs for valves that control the flow of ammonia in the Ammonia Refrigeration System to production and warehouse areas at the Chelsea Facility, including without limitation the System's main high-pressure liquid valves, high-pressure receiver king valves, main hot gas valves, and main pumped liquid valves;

p.      failing to install valve tags that are incorporated into the operating procedures and piping and instrumentation diagrams for the Ammonia Refrigeration System;

q.      failing to label all other equipment and piping that uses or contains ammonia;

      r.        failing to develop an effective preventive maintenance program, including without limitation testing safeties and cutouts for compressors, vessels, and machinery controls in the Ammonia Refrigeration System, a written schedule describing the nature and timing of each task to be performed for each piece of equipment at the facility that uses or contains ammonia, and the documentation of process safety information for the System including all controls, control set-points, testing procedures, and testing results; and

      s.        failing to obtain the required permits from the City of Chelsea, including without limitation the Chelsea Department of Inspectional Services, prior to installing the Ammonia Refrigeration System at the Chelsea Facility.

95.     The Chelsea Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that they failed to design and maintain the Chelsea Facility as a safe facility taking such steps as were necessary to prevent a release of an extremely hazardous substance at or from the Chelsea Facility.

96.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, the Chelsea Defendants are each liable for the payment of a civil penalty to the United States of up to $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and of up to $37,500 per day for each violation occurring after January 12, 2009, of the general duty to design and maintain the Chelsea Facility as a safe facility taking such steps as are necessary to prevent a release of an extremely hazardous substance, at or from the Chelsea Facility, pursuant to Section 112(r)(1) of the CAA.

### THIRD CLAIM FOR RELIEF
(CAA Section 112(r)(1) – Failure to Minimize Consequences)

97.    All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

98.    Pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), at all times relevant to the allegations in this Complaint, the Chelsea Defendants each had a general duty to minimize the consequences of an accidental release of an extremely hazardous substance at or from the Chelsea Facility.

99.    Industry standards and guidelines for RAGAGEP with respect to ammonia refrigeration systems are found, *inter alia*, in the IIAR ARM Program, the IIAR PSM Guidelines, ANSI/IIAR Standard 2, ANSI/ASHRAE Standard 15, IIAR bulletins, and other materials (including updates and revisions) consistently relied upon by refrigeration experts.

100.    The recommended industry practice and standard of care for minimizing the consequences of an accidental release of an extremely hazardous substance at a facility employing an ammonia refrigeration system of the same size and type as the Ammonia Refrigeration System is, *inter alia*, to design and implement an emergency response plan that specifically addresses release scenarios developed from hazard analyses and facility-based knowledge, includes communication with and involvement of emergency planning and response officials (*e.g.*, the LEPC), incorporates accident training for employees, and involves conducting periodic exercises to ensure that the plan is adequate to address emergency scenarios. IIAR, ANSI, ASHRAE, and other organizations have developed standards and guidelines for this purpose, including, *inter alia*, the IIAR PSM Guidelines, ANSI/IIAR 2-2008, the IIAR ARM Program, and ANSI/ASHRAE Standard 15. *See also,* EPA GDC Guidance, Section 2.3.3.

26

101.    At all times relevant to the allegations in this Complaint, the Chelsea Defendants each failed in its general duty to minimize the consequences of an accidental release of an extremely hazardous substance at or from the Chelsea Facility, in accordance with applicable industry standards, in at least the following respects:

a.    failing to prepare an emergency response plan addressing ammonia-related hazards, procedures for notifying appropriate authorized emergency response personnel in the event of a release, and describing emergency response methods for addressing the release of ammonia, in accordance with applicable industry standards;

b.    failing to provide employees at the Chelsea Facility with adequate hazardous materials response training, in accordance with applicable industry standards;

c.    failing to post signs at all entrances to the machinery room of the Ammonia Refrigeration System providing information related to the ammonia contained therein, including without limitation information regarding the Ammonia Refrigeration System, hearing protection, ammonia first aid, authorized personnel, and confined spaces, in accordance with applicable industry standards;

d.    failing to post evacuation maps in conspicuous locations at all exit doors of the machinery room for the Ammonia Refrigeration System, in accordance with applicable industry standards;

e.    failing to adequately mark the location of personal protective equipment and other hazardous materials emergency equipment for the Ammonia Refrigeration System, in accordance with applicable industry standards;

f.    failing to adequately maintain at least one of the exit doors of the machinery room for the Ammonia Refrigeration System, by, for example, installing proper

signage, an emergency switch, and an audio-visual alarm, in accordance with applicable industry standards;

       g.     failing to operate and maintain the air intake louvers in the machinery room of the Ammonia Refrigeration System so that they are normally open and require power to close, rather than the other way around, in accordance with applicable industry standards;

       h.     failing to install an eye-wash or shower at the Chelsea Facility, for use in the event of a release of an extremely hazardous substance at or from the Facility, in accordance with applicable industry standards;

       i.     failing to adequately mark the floors of aisles in the machinery room of the Ammonia Refrigeration System, to facilitate the evacuation of the room in the event of an emergency, such as the release of anhydrous ammonia, in accordance with applicable industry standards; and

       j.     failing to implement a program for auditing compliance with the general duty to minimize the consequences of an accidental release of an extremely hazardous substance at or from the Chelsea Facility, under CAA Section 112(r)(1), 42 U.S.C. § 7412(r)(1), in accordance with applicable industry standards.

102.    The Chelsea Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that they failed to minimize the consequences of an accidental release of an extremely hazardous substance at or from the Chelsea Facility.

103.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, the Chelsea Defendants are each liable for the payment of a civil penalty to the United States of up to $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; and up to $37,500 per day for each violation

occurring after January 12, 2009, of the general duty to minimize the consequences of an accidental release of an extremely hazardous substance at or from the Chelsea Facility, pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

## FOURTH CLAIM FOR RELIEF
(CERCLA Section 103 – Failure to Immediately Notify the National Response Center)

104.     All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

105.     The Chelsea Facility is an "onshore facility," within the meaning of Sections 101(9), 101(18) and 103(a) of CERCLA, 42 U.S.C. §§ 9601(9), 9601(18), and 9603(a), and 40 C.F.R. § 302.3.

106.     JSB and Anderson each was "in charge" of the Chelsea Facility, within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

107.     Anhydrous ammonia is a "hazardous substance," within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and 40 C.F.R. § 302.3.

108.     On or about April 1, 2009, there was a "release" of anhydrous ammonia, within the meaning of Sections 101(22) and 103(a) of CERCLA, 42 U.S.C. §§ 9601(22) and 9603(a), and 40 C.F.R. § 302.3, in an amount equal to or exceeding the "reportable quantity" of 100 pounds for anhydrous ammonia, within the meaning of Sections 102 and 103(a) of CERCLA, 42 U.S.C. §§ 9602 and 9603(a), and 40 C.F.R. § 302.3, at or from the Chelsea Facility.

109.     On April 1, 2009, at or shortly after the time of the 2009 Release, the Chelsea Defendants each had actual or constructive "knowledge" of the release of anhydrous ammonia at or from the Chelsea Facility, within the meaning of Section 103(a) CERCLA, 42 U.S.C. § 9603(a).

        f.      RY 2006 form never submitted;

        g.      RY 2007 form never submitted;

        h.      RY 2008 form submitted over two months late, on or about May 8, 2009;

        i.      RY 2009 form submitted over one month late, on or about April 7, 2010;

        j.      RY 2010 form never submitted;

        k.      RY 2011 form submitted over three weeks late, on or about March 23,

2012; and,

        l.      RY 2012 form submitted over nine months late, on or about December 4,

2013.

146.    Each day that each Chelsea Defendant failed to timely submit a Chelsea Inventory Form, for either anhydrous ammonia or sulfuric acid, to the appropriate LEPC, the SERC, and the fire department with jurisdiction over the Chelsea Facility, constitutes a separate violation of Section 312 of EPCRA, 42 U.S.C. § 11022.

147.    Pursuant to Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), as amended by the DCIA and the Inflation Adjustment Rule, each Chelsea Defendant is liable for the payment of a civil penalty to the United States of up to $37,500 for each violation of EPCRA Section 312 occurring after January 12, 2009.

**TENTH CLAIM FOR RELIEF**
(EPCRA Section 312 – Lawrence Facility)

148.    All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

149.    Pursuant to Section 312 of EPCRA, 42 U.S.C. § 11022 and 40 C.F.R. Part 270, commencing on or before the March 1 following the date upon which the Lawrence Defendants

153.    Pursuant to Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), as amended by the DCIA and the Inflation Adjustment Rule, each Lawrence Defendant is liable for the payment of a civil penalty to the United States of up to $37,500 for each violation of Section 312 of EPCRA, 42 U.S.C. § 11022.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States of America respectfully requests that this Court enter judgment, for the United States and against Defendants, providing the following relief:

1.    Permanently enjoin JSB and Anderson from all ongoing and future violations of the CAA, CERCLA, and EPCRA, including Sections 112(r) of the Clean Air Act, 42 U.S.C. § 7412(r), Section 103 of CERCLA, 42 U.S.C. § 9603, and Sections 304, 311, and 312 of EPCRA, 42 U.S.C. §§ 11004, 11021, and 11022, and their implementing regulations;

2.    Permanently enjoin JSB and JMG from all ongoing and future violations of EPCRA, including Sections 311 and 312 of EPCRA, 42 U.S.C. §§ 11021 and 11022, and its implementing regulations;

3.    Order Defendants JSB, Anderson, and JMG each to pay a civil penalty for each day of each of their respective violations of the CAA, CERCLA, and EPCRA enumerated in this Complaint.

4.    Award the United States its costs of this action; and

5.    Grant the United States such other relief as the Court deems just and proper.

Respectfully Submitted,

JOHN C. CRUDEN
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

Dated: 6/20/16

DAVID L. WEIGERT
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-0133

CARMEN M. ORTIZ
United States Attorney

JESSICA P. DRISCOLL
Assistant United States Attorney
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3398

OF COUNSEL:

HUGH W. MARTINEZ
Senior Enforcement Counsel
U.S. Environmental Protection Agency
Region 1 – New England
5 Post Office Square, Suite 100
Boston, MA 02109